* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Griffin and the briefs and arguments before the Full Commission. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all relevant times, plaintiff was an employee of defendant-employer.
2. Protective Insurance Company is the carrier on the risk.
3. Plaintiff's average weekly wage is $870.86 per week.
4. The following were marked and received into evidence at the Deputy Commissioner's hearing as:
 a. Stipulated Exhibit Number 1, Pre-Trial Agreement
 b. Stipulated Exhibit Number 2, Medical Records, which were submitted after the Deputy Commissioner's hearing
 c. Defendants' Exhibit Number 1, Insurance Adjuster Summary of Damage to Plaintiff's Home Following Hurricane Isabel
 d. Defendants' Exhibit Number 2, Defendant-Employer's Computer Printout of Customer Order Sheet
 e. Defendants' Exhibit Number 3, Letter From Human Resources to Plaintiff, dated September 19, 2003
 f. Defendants' Exhibit Number 4, Plaintiff's Responses to Defendants' Interrogatories and Request for Production of Documents
 g. Defendants' Exhibit Number 5, Great West Healthcare Short Term Disability Benefits Explanation of Benefits
 h. Defendants' Exhibit Number 6, Phenix Investigations, Inc. Surveillance Report for dates November 18, 19, and 20, 2004
 i. Defendants' Exhibit Number 7, Phenix Investigations, Inc. Surveillance Report for dates April 9, 10, and 11, 2005
 j. Defendants' Exhibit Number 8, DVD Surveillance, which corresponds to the surveillance report identified as Defendants' Exhibit Number 6
 k. Defendants' Exhibit Number 9, DVD Surveillance, which corresponds to the surveillance report identified as Defendants' Exhibit Number 7
5. The issues before the Full Commission are whether plaintiff sustained injuries by accident while in the course of her employment with defendant-employer on June 24, 2003 and on September 16, 2003, and, if so, what compensation she is entitled to receive.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 51 years old. Plaintiff completed the tenth grade and subsequently obtained a GED.
2. Prior to her employment with defendant-employer, plaintiff worked as a security officer at resort hotels. As a security officer, plaintiff was required to obtain a private security license and firearm certification. Plaintiff also worked as a nail technician and instructor. Plaintiff obtained the required vocational training and licensing needed for these positions. Other positions plaintiff held include a bookkeeper for a furniture store and an office manager for a pool company. In 1996, plaintiff completed truck-driving school and obtained a Commercial Driver's License. For approximately 15 months, plaintiff worked as truck driver for C.R. England in California.
3. In February 1998, plaintiff began working for defendant-employer as a truck driver on a dedicated run from Chesapeake, Virginia to Greensboro, North Carolina. When she arrived in Greensboro, plaintiff swapped loaded trucks with another truck driver. Plaintiff worked from Monday evenings to early Saturday mornings each week hauling goods for one particular customer. Plaintiff was not responsible for loading or unloading any freight. As a truck driver for defendant-employer, plaintiff was also responsible for completing paperwork, checking shipping papers, maintaining driver's trip logs, and complying with applicable state and federal regulations.
4. On January 19, 2000, Dr. Lloyd P. Hitchings, a neurologist, examined plaintiff for complaints of numbness, primarily in her hands and feet. Plaintiff also reported sharp, stabbing pain in her upper back when she stood for more than 15 minutes. After reviewing the results of the diagnostic testing, Dr. Hitchings diagnosed plaintiff with carpal tunnel syndrome, mild neuropathy, and fibromyalgia. Dr. Hitchings prescribed several medications to treat plaintiff's conditions.
5. In April 2000, Dr. Hitchings ordered an MRI scan of plaintiff's cervical spine to rule out the possibility of cervical disc disease. The MRI scan revealed a central disc herniation at C5-6, which extended inferiorly along the posterior border of the C6 vertebral body deviating the spinal cord. Dr. Hitchings referred plaintiff to a neurosurgeon for further evaluation.
6. On January 15, 2001, Dr. Victor G. Sonnino, a neurosurgeon, evaluated plaintiff at the request of Dr. Hitchings. Plaintiff reported pain and numbness in the neck, arms and legs for about a year and a half. Dr. Sonnino recommended a repeat MRI scan of the cervical spine, which revealed a rather large herniated disc at C5-6 that was subligamentous and unchanged from the previous study.
7. In November 2000, Dr. Vern Metcalf began treating plaintiff for complaints of pain in the cervical and upper lumbar spine and pain in her wrists. Dr. Metcalf was of the opinion that plaintiff suffered from a chronic pain syndrome rather than fibromyalgia.
8. On January 5, 2001 and February 9, 2001, plaintiff underwent bilateral carpal tunnel releases performed by Dr. Glenn R. Carwell, Jr. In December 2001, plaintiff underwent breast reduction surgery, which caused complications and required additional surgeries in 2002.
9. On May 23, 2003, plaintiff sought treatment with Dr. Metcalf for complaints of generalized malaise and fatigue. Plaintiff also reported that her joints were aching with a little stiffness and swelling. Dr. Metcalf diagnosed plaintiff with fibromyalgia and prescribed medication to treat the condition.
10. On June 24, 2003, plaintiff drove her truck from Chesapeake, Virginia to Greensboro, North Carolina. Plaintiff met a co-employee, Charlotte Linker, at a fuel stop so they could exchange trucks. The trucks were parked beside each other in the parking lot. While on the passenger side of the truck removing her personal items, plaintiff began climbing down the truck steps. As she was stepping down from the truck's running board, plaintiff lost her footing as her foot landed on the ground where the pavement ended and dirt began. Plaintiff fell backwards and landed on her back, with her right leg and foot underneath her body. Plaintiff's left shoulder hit the ICC bar of Ms. Linker's truck, which resulted in a large bruise. A few minutes later, plaintiff was able to get her bearings and stand up with assistance from Ms. Linker. Plaintiff was able to finish her truck route that evening. Ms. Linker corroborated the testimony of plaintiff regarding how the accident occurred.
11. Plaintiff did not report her fall off the truck to her employer because, at that time, she did not believe that she was seriously injured. Additionally, plaintiff was concerned about losing her safety bonus if she reported her fall to the safety director, Frederick Rose. Ms. Linker indicated that if a work-related incident was reported to Mr. Rose, the employee lost all safety bonuses for a year, regardless of fault. Ms. Linker and her husband, who also worked for defendant-employer, did not report work-related incidents because of defendant-employer's safety bonus policy. Plaintiff's testimony regarding the June 24, 2003 fall and her explanation for not reporting the same to her employer are deemed credible.
12. From June 24, 2003 through September 16, 2003, plaintiff continued to drive her regular run between Chesapeake and Greensboro. During this time, plaintiff did not seek medical treatment related to her June 24, 2003 fall, despite experiencing pain in her neck, right shoulder, arm, and hand.
13. In early September 2003, defendant-employer informed plaintiff that the contract for the route to Chesapeake, Virginia had not been renewed. Defendant-employer offered plaintiff another route, but it required her to transfer to another terminal outside of her residential area. As a result, plaintiff declined the offer to relocate for another truck driving position. Plaintiff's last run for defendant-employer was scheduled for September 16 through 17, 2003.
14. During the early hours of September 16, 2003, plaintiff arrived in Portsmouth, Virginia, which was the end of her run. Plaintiff began hooking the trailer to the truck. In order to make adjustments, plaintiff used all her strength to unwind the crank. As she was unwinding the crank, plaintiff experienced sharp burning pain in her right arm, which radiated into her shoulder and wrist. The most significant pain was in plaintiff's elbow and forearm. On past occasions, plaintiff had used both of her hands to unwind the crank.
15. On September 16, 2003, plaintiff had several conversations with the terminal manager and her driver manager regarding the approaching hurricane, but not about the cranking incident. On September 17, 2003, plaintiff returned to her residence to prepare her home for the arrival of Hurricane Isabel. Plaintiff removed patio furniture, gathered her animals, secured the home, and packed her vehicles with clothes and other personal necessities before leaving her home. On September 20, 2003, plaintiff returned home and assessed the damage to her home and yard.
16. On September 22, 2003, plaintiff sought treatment with Dr. Metcalf for complaints of numbness and tingling in her hands, which was worse on the right side. Plaintiff reported using her body weight to crank a trailer, due to lack of strength in her right arm. Plaintiff also reported falling off her truck six weeks previously and landing on her neck, shoulder, and back. Dr. Metcalf recommended an ice pack to the elbow and the arm and a neutral wrist splint. Dr. Metcalf also prescribed medications, physical therapy, and an EMG of the right arm and neck. Although plaintiff failed to report the cranking incident to her employer, she sought medical treatment within a week and reported the event to her physician. The Full Commission deems plaintiff's testimony about the cranking incident on September 16, 2003 as credible.
17. Dr. Richard Wertheimer, a neurologist, evaluated plaintiff upon referral from Dr. Metcalf. Dr. Wertheimer ordered an MRI scan of the cervical spine, which revealed a slight disc bulging and uncovertebral spurring at C5-6. There was also focal disc herniation central and to the right at C6-7. On November 5, 2003, Dr. Wertheimer performed an EMG and nerve conduction study of the right upper extremity. The results of the studies revealed right C7-T1 radiculopathy and mild right median neuropathy at the wrist. Based on the results of the various diagnostic tests, Dr. Wertheimer recommended a referral to a neurosurgeon, Dr. Fatehi, who plaintiff had seen previously. Plaintiff refused the referral to Dr. Fatehi and requested a referral to a different physician.
18. On November 12, 2003, Dr. Michael Romash, an orthopaedic surgeon, evaluated plaintiff upon referral from Dr. Metcalf. Dr. Romash diagnosed plaintiff with a herniated cervical disc with slight signs of myelopathy and radiculopathy. Dr. Romash referred plaintiff to Dr. Beth Winke in his practice for further evaluation and conservative treatment.
19. On November 14, 2003, Dr. Winke evaluated plaintiff, who reported the June 24, 2003 fall from her truck. As a result of the fall, plaintiff told Dr. Winke that she had aches and pains everywhere, with right arm pain worsening over the past few weeks. Plaintiff denied any left upper extremity symptoms and denied any prior neck or arm problems. Dr. Winke diagnosed plaintiff with a central disc herniation at C6-7. Dr. Winke recommended physical therapy and discussed a cervical epidural injection, which plaintiff declined at the time.
20. At a visit to Dr. Winke on June 18, 2004, plaintiff reported right shoulder pain, which became worse after she did some painting around her house. As a result of the examination, Dr. Winke ordered an MRI scan of the right shoulder, which revealed some acromial impingement with some mild degeneration of the supraspinatus tendon. Dr. Winke recommended exercises for plaintiff's right shoulder impingement.
21. From June through October 2004, Dr. Winke provided plaintiff with acupuncture treatment. On October 12, 2004, Dr. Winke referred plaintiff to Dr. David Goss, an orthopaedic spine specialist in her practice group. On October 26, 2004, Dr. Goss evaluated plaintiff for complaints of neck pain and bilateral upper extremity pain radiating into the ulnar two digits. Dr. Goss recommended a repeat MRI scan, which revealed no changes at the C5-6 level and some improvement at the C6-C7 level. Dr. Goss offered surgery as an option for plaintiff, but also indicated that he was uncertain if the findings of the MRI were causing her symptoms. On December 9, 2004, Dr. Goss released plaintiff to return to full duty work without restrictions and to return on an as needed basis.
22. At the request of her short-term disability carrier, plaintiff underwent a Functional Capacity Evaluation (FCE) on August 30, 2005. At times throughout the FCE, plaintiff exhibited self-limiting behavior due to pain. The FCE revealed plaintiff was capable of working in the sedentary physical demand category for an eight-hour day, with some lifting ability in the light level on an occasional basis.
23. During the first session of her deposition, Dr. Winke testified to a reasonable degree of medical certainty that plaintiff's cervical disc herniation was related to her work injury, which occurred on June 24, 2003. After further questioning, Dr. Winke admitted that she was unaware of plaintiff's history of neck and upper extremity symptoms and had not reviewed any of plaintiff's medical records. Dr. Winke acknowledged that her opinion on causation was substantially based on plaintiff's denial of neck and upper extremity problems preceding her June 2003 injury. Dr. Winke also testified that if a herniated disc is caused by trauma, then the patient should exhibit symptoms within 24 to 48 hours of the inciting event or no more than one week later. After reviewing Dr. Metcalf's August 11, 2003 office note and learning that plaintiff did not seek medical treatment from June 24, 2003 through August 11, 2003, Dr. Winke changed her opinion that the June 24, 2003 fall caused plaintiff's cervical disc herniation. Dr. Winke stated that, "I don't see how it could be related."
24. At the second session of her deposition, Dr. Winke again changed her opinion regarding the cause of plaintiff's cervical disc herniation. Initially, Dr. Winke opined that plaintiff's cervical disc herniation was caused by the fall on June 24, 2003 and was exacerbated by the September 16, 2003 cranking incident. Dr. Winke further opined that plaintiff's right shoulder impingement was caused by the June 24, 2003 fall. On cross-examination, Dr. Winke admitted her opinions were based on speculation that plaintiff was experiencing symptoms between June 24, 2003 and August 11, 2003, but failed to report the symptoms or seek medical treatment during this period. Dr. Winke also testified that her opinion was based on a temporal relationship between the onset of plaintiff's symptoms and the accidents she reported. Upon further cross-examination, Dr. Winke changed her opinion once again to say that it was possible that plaintiff's cervical spine and shoulder conditions were caused by either the June 24, 2003 or the September 16, 2003 incident, but she could not state that it was probable. Dr. Winke gave conflicting and inconsistent opinions regarding the cause of plaintiff's cervical disc herniation and right shoulder impingement. Due to the inconsistencies and the unreliable basis for her opinions, the Full Commission does not assign weight to the opinions expressed by Dr. Winke.
25. Dr. Goss reviewed plaintiff's medical records concerning evaluation and treatment of her cervical spine, neck and upper extremity complaints prior to the 2003 incidents. Dr. Goss noted that plaintiff's complaints were substantially similar to her complaints at the time of his examinations in October and December 2004. According to Dr. Goss, if a patient experienced a traumatically induced herniated cervical disc, then he would expect the patient to probably seek medical treatment immediately. In this case, Dr. Goss noted a significant delay in plaintiff's June 24, 2003 fall and the time she actually sought medical treatment. Based on these facts, Dr. Goss opined and the Full Commission finds that plaintiff's neck and upper extremity pain are the natural progression of her pre-existing cervical degenerative disc disease and not the result of the June 24, 2003 fall.
26. Dr. Goss also opined and the Full Commission finds that the symptoms for which he evaluated plaintiff were not caused by the September 16, 2003 cranking incident. In response to questioning about the cranking incident exacerbating plaintiff's pre-existing degenerative disc disease, Dr. Goss indicated that it was possible that the cranking incident temporarily exacerbated her pre-existing condition. If there was an exacerbation, however, it was resolved and plaintiff had returned to her baseline condition by December 2003. It is Dr. Goss' opinion and the Full Commission finds that the September 16, 2003 cranking incident did not materially or permanently exacerbate plaintiff's preexisting cervical degenerative disc disease.
27. Plaintiff has the burden to establish that her cervical disc herniation and right shoulder injury are causally related to either the June 24, 3003 fall or the September 16, 2003 cranking incident. Expert medical opinions based on mere speculation and conjecture are not competent evidence on issues of medical causation. In this case, the medical evidence is insufficient to support plaintiff's burden of proving causation to establish compensability.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. "In a workers' compensation claim the employee has the burden of proving that his claim is compensable." Holley v. ACTS, Inc.,357 N.C. 228, 231, 581 S.E.2d 750, 752 (2003). In many instances, the facts in evidence are such that any layman of average intelligence would know what caused a person's injuries; however, the exact nature and cause of some injuries must be established by expert opinion evidence. Click v.Freight Carriers, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). To establish causation, the evidence must rise above the level of mere speculation and conjecture. Holley, 357 N.C. at 232, 581 S.E. 2d at 752. In this case, the medical opinions of Dr. Winke are inconsistent and based on mere speculation. Accordingly, plaintiff has not established a causal link between her work accidents and her cervical disc herniation and right shoulder condition.
2.Plaintiff is not entitled to workers' compensation benefits under the Act. N.C. Gen. Stat. § 97-2(6).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for benefits under the Act is HEREBY DENIED.
2. Each side shall bear its own costs.
This 18th day of December, 2006.
S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________________ DIANNE C. SELLERS COMMISSIONER